Case number 17-1246 et al. Joe Fleming, Individually, and as Joe Fleming Stables, Petitioner, v. United States Department of Agriculture. Mr. Boyles for the Petitioners, Mr. Mutham for the Respondents, Mr. Shaw for the Court Appointed Amicus Curiae. Mr. Boyles, please proceed when you're ready. Thank you, Your Honor. If it pleases the court, we're here because the government has requested remand of the petitioner's cases before an administrative law judge appointed by the secretary. This will be a properly appointed administrative law judge who will consider the evidence and decide whether the petitioners violated the Horse Protection Act. The government acknowledges that Section 7521 raises grave concerns of certain ambiguous statutory phrases or not properly construed to save it from unconstitutionality. This is because the MSPB's construction of the statute and application of it is, quote, too high, too expensive, and plainly unconstitutional. More importantly, Free Enterprise Fund unambiguously holds that officers cannot have dual-level petitioner protection. Mr. Boyles, before we go too far into the weeds on the merits, can I just ask you as a threshold matter about the exhaustion question in the case? And, in particular, let me ask it this way. Let's suppose I agree with your submission that the statutory provision 6912E is non-jurisdictional. But let's suppose I also think that it contemplates a mandatory exhaustion requirement in the way that the Supreme Court's decision in Ross thought about mandatory. And let's suppose that the regulation, the most relevant regulation, 1.145E, involves an issue exhaustion requirement. Then where does that leave you vis-à-vis exhaustion? Well, of course, we don't accept the conclusion that 1.145E is itself an issue preclusion criteria. But accepting that, there are five grounds on which a non-jurisdictional preclusion statute can be avoided. And I think it's applicable to 5 to 1.45, even if interpreted as you have asked me to assume. And they're particularly applicable in this case because those exclusions which are listed in the cases cited in Munsell, there are whether the remedy on remand would be inadequate, which it would be, whether the claimant makes a constitutional challenge, which we do, whether the claimant contends the administrative process itself is unlawful, and where exhaustion would be futile. And finally, as relevant to the question of remand, whether if the case was remanded, there would be irreparable injury without immediate judicial relief. Can I just stop you there and ask you this, which is that I understand that those exceptions, I understand your submission that those exceptions can be found in the case law, but what I'm not following is why, after Ross, Judge made caveats of that variety, Trump what I'm assuming is a mandatory rule under the statute. It seems to me that for futility, for example, that wouldn't be a possibility if you're talking about a statute that has a mandatory exhaustion requirement. And I know you've got your argument that 1.145E doesn't raise an issue exhaustion requirement under the regulations to begin with, and I want to hear what you have to say about that. But I'm not understanding with these other five possibilities how that gets one out from under a mandatory exhaustion requirement. Well, of course, we don't assume that Ross in any way conflicts with or overrules Mansell. Mansell is the law of the circuit. To simply say, well, we should disregard the fact that Mansell holds that you can provide excuses. Ross is the law of the Supreme Court. Well, Ross is the law of the Supreme Court in interpreting a statute that's not before you. So you can't just say that because it interprets one statute in a particular way, even if that statute was reverted in Mansell, that therefore you should overrule Mansell, of which three other circuits continue to follow, and none of which I suppose had the opportunity to have that. So we don't agree with the idea that Ross overrules Mansell. It's a different statute, sure. But the exhaustion requirements in the PLRA and here seem to be similar in that you have a statute that very specifically requires exhaustion in mandatory terms and is silent on whether that means claim exhaustion or issue exhaustion. And the Supreme Court seems to be pretty strict in construing exhaustion requirements like that. Well, actually, I don't agree with you. There's a recent decision, and I'm sorry I cannot just cite it off the top of my head, where this court held that there was a movement toward not finding issue preclusion in these types of statutes. And, in fact, that that was the way the Supreme Court was moving. And this was a decision after Ross. So, in fact, it was a 2020 decision, I believe. So I don't think the movement is that way. I think there's significant differences here between the context in which you're raising issue preclusion in an enforcement action where our clients are the respondents. The rule in 6912E is about where you intend to bring a lawsuit. We didn't bring a lawsuit. We got brought into an enforcement proceeding. So I think that's a fundamental distinction. And as I explained in my brief, that statute arises out of the 1994 creation of the National Appeals Division. It set forth four statutory requirements that had to be met before you could bring a lawsuit. I don't believe that the government has cited any case, at least I don't remember any case coming to my attention, where it was applied to an enforcement proceeding, an enforcement case in the sense that this is an enforcement case. In Munsell, the only procedure, the procedure that the court, this court, found that they did not violate because it would not have been futile is 9305.6, which says nothing more than program employees, which is Munsell, shall not, in a manner prescribed by the administrator, shall, I'm sorry, shall report in a manner prescribed by the administrator all violations of the act or regulations in the sub-chapter of which they have information. Well, they had information. They were the ones complaining about it. They just didn't take it to the administrator. Certainly, we took to the judicial officer that the ALJ's appointments violated the separation of powers. It's throughout our brief, and we've tried to summarize that, and, of course, I could review from the record the places where we specifically pointed out that the ALJ's appointments violated separation of powers. We did not mention the real tenure provision that's applicable to officers because at the time, the ALJ was not an officer. The ALJ was an employee. May I reserve my time for rebuttal? Actually, I have some more questions. Okay. I did. If we're done with the exaltion point, I had a question on remedies, which I know is perhaps a difficult question here. Sonya, if we accept your argument that the DUBRA for-cause protection is unconstitutional, can you say more about the remedy that you want here? Because you brought an as-applied challenge to these particular agriculture department ALJs. So what would be the appropriate remedy if we were to agree with that as-applied challenge? Yes, it is an as-applied challenge. It's not one of the provisions, as far as I'm concerned, 7521 W105 or 1202B. They're not facially unconstitutional. There may be many ALJs to whom those are perfectly appropriate because they're not officers. So if it's an as-applied, the goal of the court is to remedy the injury that the petitioners have suffered. And as we pointed out in our brief, there are several cases even in the D.C. Circuit. Guardian moving in storage is a case that wasn't remanded because it would have made no sense, or it, as they say, serves no useful purpose. Northern Pipeline is a Supreme Court case where, in the end, the petition was dismissed because the bankruptcy court did not have jurisdiction. Yes, Ms. Rose, I understand you don't want a remand to the agency, but what precisely would we, in your view, should we hold unconstitutional as-applied? What portion of 7521? No portion of 7521. You should deny remand and dismiss the cases because there is no lawful authority to whom to remand them. It's not 7521 that I don't want you to do anything with 7521. It's a perfectly good statute as to ALJs who are employees. The only two ALJ groups that we know about are the SECs and the USDAs who are adjudicatory officers in enforcement proceedings that then enforce penalties monetarily and to suspend people. It seems to me if you have no place to send it, then the alternative is to dismiss it. It should have been dismissed by the ALJ because that's the precedent in the Wise case, which we cite, as to what should be done when the ALJ has no power to enter an order. They can't enter an lawful order in our case, finding our people didn't violate the Horse Protection Act. If they can't enter an order because they are not lawfully appointed officers that would punish us, they also can't enter a lawful order that would absolve us. The only remedy is since you have no place to send it, to dismiss it. Let me ask the question this way, which is suppose I agree with you on the merits of the Double IV cause and I disagree with you that we have to just blow the whole scheme up. I'm going to give you a choice of two options and you tell me which one you would prefer. Option number one is we recognize the conceded error under Lucia and then we remand to the agency. We don't do anything else and then they just re-adjudicate. Option number two is we address not only the Lucia issue but the Double IV cause removal. We find that to be a violation and therefore we say that we will excise from 7521 the provision for MSPB review of the good cause determination so the ALJ still has tenure protection but we're cutting out the second level and we remand on that basis. Well, I don't know. Number two is the preferable option because at least when there's a remand and the separation of powers issue is resolved and the ALJ is lawfully appointed, we won't be subjected to a meaningless proceeding. There won't be a lawful ALJ. There won't be a lawful judicial officer but the answer is simple. Number two, could I address you though on the consequences of saying that the MSPB, you excise that portion. May I take that time? Sure. Okay. The second portion, think about it. If you say, well, the MSPB doesn't decide it. The secretary does and Congress could do that but if you do that, read the statutes that are intertwined with that. For example, who would be ALJ who can't be discharged for good cause and the secretary fires him? What court would they appeal to? The only court that's authorized by Congress to decide that question is the federal circuit and then only from a final order of the MSPB. That's just an example of one statute that's tied in to this and that's 5 U.S.C. section 7521. Are you going to hold that the MSPB under 5 U.S.C. 1305 can no longer prescribe regulations saying what good cause is? That's a power Congress gave them. So there's a number of other statutes. 5 U.S.C. section 5372 authorizes the Office of Personnel Management to make regulations binding on the agencies. Is that unconstitutional if the Office of Personnel Management, as it has, says that each agency is under a duty to ensure the judicial and decisional independence of the ALJs? So I don't see how it's possible to excise that end of 7521. I think it involves numerous other statutes and a number of existing regulations promulgated by the OPM and the MSPB, including 5 C.F.R. 1201, 137, 5 C.F.R. 1201, 56, 5 C.F.R. 1201. So you have to look at a lot of things before you consider that. I'm sorry to have taken so much time. So I have a question then. If you think those are interconnected, if that remedy would pose problems with other parts of the statute, what about a remedy that held that the for-cause removal and the MSPB layer of review were both unconstitutional as applied to USDA ALJs? So effectively, they would be removable at will. Okay. What I would think is that the first pleading I would file when we got back was that we're being denied due process of law because we're now in front of a person that can be hired and fired by the Secretary. Let me make one point. On July the 10th, after Lucia was decided in 2017, the court then issued an executive order that took away all of the provisions that required the appointment of a competent person, a lawyer, who had taken a task, who was qualified in the area to be an ALJ. Now, the head of a department can appoint his brother-in-law. Well, we wouldn't like that. That would be a violation of our due process to have a judge who is appointed by the Secretary without any restraints whatsoever on qualifications and then to pop that off with no restraints on removal. Well, is it a violation of due process for the Secretary to decide the case himself? Because that's what the statute also is. The Secretary could decide himself. Of course, I think it is, but that's not the law. Well, guys, this is not a clarification then. So you don't take issue with the good cause requirement in 7521. If anything, it sounds like you celebrate the good cause requirement and you celebrate it in the way that the MSPP has construed what good cause means. In other words, not a more relaxed version of good cause that's being put forward by the government. You like the robust good cause requirement. Your problem is the second layer. I even like it with two levels as it has, but I can't see how that can possibly be constitutional anymore. The answer is yes. Well, that's why I asked you the question I did, because it seems like, I mean, all of your Article II arguments tug in the direction of giving the administrative adjudicators less independence rather than more. But as soon as we start doing that, you have all of these due process-like arguments that you're running to say, well, we can't sever this or that because we're creating greater due process concerns. And we take that to its logical conclusion. You can't have agency adjudication, and that is one conclusion that we know is wrong. That's correct. But you also can't have judicial fixes where that's not appropriate. The biggest separation of power issue would be when you start trying to think of a way to solve the problem and legislate a solution that involves a tremendously complicated statute, Title V, and not just one statute but multiple chapters within Title V. And so all I'm suggesting or what I'm saying is you shouldn't do the fix. You should just say it's broken, and then Congress would need to do the fix. That is also our argument, and we think that certainly the Fifth Circuit, to some extent the Supreme Court, they're moving away from trying to fix every problem, and maybe it's time that Congress fix this problem. I would make a good suggestion if Congress wanted to listen to me, which it wouldn't, and that is the tax court doesn't have this problem. Its judges have a degree of judicial independence. They're not a part of an agency. They were taken out. They are a legislative court. Let's create, which was one of the options, and it was rejected in 1946, but let's create legislative courts. Let's handle administrative matters. If the courts keep on trying to fix Congress's problems, Congress will never do it. Okay, Mr. Boyles, my colleagues don't have any further questions for you at this point. I'll just make sure that that's the case. I'm good. Yes, I'm good, too. We'll give you a little bit of time for a rebuttal, and we'll hear from the government now. Mr. Mookin. May it please the Court, caution was... By both statute and regulation, petitioners were required to raise before the agency their objection that the agency's ALJs cannot constitutionally adjudicate their cases in light of the statutory removal restriction. Section 6912E provides that notwithstanding any other provision of law, a person shall exhaust all administrative appeal procedures established by the Secretary. That is true, and the statute is mandatory. I'll give you that, and to that extent, we can't make exceptions. But it's silent on whether issue exhaustion is required, and to top that piece down, I think you need the regulation, right? That's exactly what I was about to say, Your Honor. Where the procedures established by the Secretary, regulation 1.145A, said each issue and the arguments regarding each issue shall be plainly and concisely stated and shall contain detailed citations to the authorities being relied upon. That is unambiguously an issue exhaustion requirement. It is, but it has an exception. It permits the agency adjudicator to excuse forfeitures. It says exactly what you said, and then it says the J.O. nonetheless can consider unexhausted issues at the J.O.'s discretion. So why would we be trampling on agency prerogatives if we said that's fine, we respect what the agency has done, and we will just impose on ourselves the same rule? And then we just consider, we just exercise our discretion to consider whether the forfeiture should be excused, which is exactly what the J.O. can do. Because that is asserting the J.O.'s prerogatives. The rule says that the J.O. can decide whether to exercise to a spontaneous discretion to excuse the forfeiture, and in this case, the J.O. did not do so. And nothing about the J.O.'s decision to do that is unlawful or arbitrary and capricious. So therefore, you have a regulation that was validly promulgated by the agency, pursuant to both its general rulemaking authority and its specific rulemaking authority under the Horse Protection Act. And under those rules, the petitioners here forfeited their claim. The agency is entitled to rely on those rules, just as likely courts are. It is true that the agency could have excused the forfeiture, but the agency did not excuse the forfeiture. And this court has no authority to second-guess that decision unless it is itself unlawful or arbitrary and capricious. And there is no— I suppose that argument would address this situation because you could have a circumstance in which under, as Judge Katz had said, the authority for the judicial officer to recognize an issue, even if it hasn't been raised. Suppose the judicial officer considers that possibility and specifically declines to do it. And says, you know, there is this other issue that's out there. I've seen it in the case law. Nobody's raised it before me. And in theory, I could consider it, but I choose not to because of the regulation that confines parties to the issues raised. It gives me this authority, but I'm not going to exercise that authority. And then if that were the case, but we could act on it anyway, then we would be doing something in the face of what the judicial officer specifically declined to do under the regulation. So, no, I think that would be an even worse example of, I think, the problem that I was articulating in response to Judge Katz's question. That would be an even clearer usurpation of the J.O.'s prerogative under the validly promulgated rule not to exercise to his property discretion. But I think that you have to construe what happened, in fact, in this case is essentially the same as your hypothetical, which is the agency has a rule that says that the only arguments that will be decided by the J.O. are the arguments that are presented by the parties, unless the J.O. exercises to his property discretion. You, therefore, have to construe the J.O.'s decision not to raise this issue as a decision to rely on that rule. And absent a basis to say that the decision to do that is itself unlawful, is either contrary to law or arbitrary and capricious, then the agency action has to stand. This is why there's a fundamental difference between judge-created forfeiture rules and judge-created exceptions and statutory and regulatory exhaustion rules. This is an APA action, and what you're reviewing is agency action. And if the agency's action here, the decision to impose penalties and the decision to disqualify the officer are based on a forfeiture, that can make the decision lawful even if there was a problem with the adjudicatory process that was forfeited. The Sixth Circuit makes this point very well in Judge Murphy's opinion in Island Creek, where he lays out in very careful detail the differences between statutory rules, regulatory rules, and judicially-created rules, and makes this precise point that when it's a regulation, as long as it's a validly promulgated regulation, then the only thing that the court has to ask is, is it contrary to law or arbitrary and capricious to apply it? This court actually, Judge Randolph has an opinion. I apologize it's not cited in the briefs, but the case name is Marine Mammal Conservancy v. USDA, the citations 134 F. 3rd 409, where Judge Randolph actually identified the same issue. He didn't actually reach it. He went on to say that there was no ground to excuse the forfeiture anyway, but he cited this exact point, which is where does the court get the authority to set aside an agency action in reliance on a validly promulgated rule? I found Judge Murphy's opinion very helpful as well. We've sort of been talking about, in his terms, we've been talking about whether this case falls in his Category 2, which is your theory that the reg ties our hands even though it gave the judicial officer discretion. Do you have an independent argument that this also falls in his Category 1 because statute is silent on claim versus issue exhaustion, but we should just think of those as one and the same under cases like Woodford? I have two points, and I think you anticipated both of them. The first point I would make is I actually think that the statute isn't silent about issue exhaustion because the precise language used is procedures established by the Secretary, and so when the Secretary establishes issue exhaustion by rule, that's not just a freestanding rule. It's a rule that is then incorporated into the statute, so that's point one. Yeah, but that just brings us back to the question of how we deal with the J.O.'s discretion, which is the loose end in Category 2. Fair enough, and then the second point, which you anticipated, is even if there wasn't a reg, we know that from the Supreme Court's decision in Woodford v. No, that exhaustion requirements typically should be construed to mean proper exhaustion, and so here it's not proper exhaustion for the same reason, that the specification here was not presented. So I think that both as a matter of the statute and as a matter of the reg, we know that there was an obligation to present this objection, and that was conceivably not complied with. There is nowhere in the petitioner's voluminous brief to the judicial officer where there's any mention of Section 7521, any mention of removal restrictions, any mention that there's an unconstitutional installation of the adjudicator from the secretary and the president. So I think it unquestionably has not been satisfied. The only last point I'd like to make on the forfeiture issue is just to point to this court's decision in Munsell, because I think it actually pretty squarely confirms the notion that 6912 has to be read as a statute with the limitations, only those limitations recognized in the statute and not more general judicial exceptions, and what I would point this court to in particular is the holding in Munsell that administrative exhaustion was required for a Bivens claim, even though you could obviously not get money damages in the agency process. The reason why that's important is that precise issue, whether you have to exhaust the Bivens claim or whether it's futile, that under the sort of judge-made law of exhaustion is deemed futile under the Supreme Court's decision in McCarthy v. Madigan. So the very same issue, whether exhaustion of Bivens is required, we know in judge-made law it's not, and we know in this statutory scheme it is. So that is a clear import of Munsell, this court's decision in Munsell, is that you treat 6912 like a statute, not like a judge-made rule where you can create judge-made exceptions. And the last point I'll make on that, by the way, is in any event, their primary argument for equitable exception is that it was futile, and it certainly was not futile in this case because at a minimum, at a minimum, what the agency could have done is the secretary could have adjudicated this issue himself. It clearly has authority to do that under the statute. That would have obviated this objection completely. And the likelihood that he would have done so is not relevant under administrative futility principles. That's the Blavine decision that we cited in our brief. And actually, the Marine Mammal case that I mentioned earlier, Judge Randolph holds that too in the specific context of a USDA adjudication. Unless there are any further questions on forfeiture, I'm happy to turn to the merits. But could he have done that without changing the reg? I thought the regs gave the first instance adjudicatory power to ALJs. So I don't think he would have to change the reg because of Reg 2.12, which makes clear that all the delegations of the secretary's power do not divest the secretary of his own power. So I think he could always have done that. Even if he didn't change the regs, did the regs build in that he retained his statutory authority? Got it. So turning to the merits, if there are no other questions on forfeiture, we think the claim fails. Properly construed, Section 7521's good cause standard allows an agency head to broadly remove an ALJ for misconduct, poor performance, or insubordination. And the statute confines the MSPB to the narrow role of establishing and determining whether factual evidence exists to support the employing agency's proffered good faith grounds for cause. That construction of the statute ensures that these inferior executive officers remain sufficiently accountable under Article 2 to their agency heads, the president, and ultimately the public, while also properly accounting for the nature of their adjudicatory functions. Can I ask you this question so that I get in my mind the government's submission on this? So suppose that the ALJs are removable for good cause in the way that the MSPB has construed good cause. And I know you have issues with that, but just bear out this assumption for a moment. So let's suppose that's true, but then that the good cause removal doesn't involve the MSPB at all, that it's carried out by the ag secretary and the ag secretary that will. Does the government think that that regime would pose a separation of powers problem such that we'd have to adopt an ultimate construction of the content of the good cause requirement? So the problem would definitely be less, but I think ultimately, at least on the first part of our submission, I think there would be a problem. If cause was construed so narrowly as the MSPB has, that even the ag cabinet secretary himself, even if he was the ultimate determiner of cause, if he was not able to remove ALJ for the types of errors and types of misconduct that the MSPB has sometimes suggested, I think that that would be an Article II problem, even without the second level. But then that has nothing to do with double for cause, obviously, as you just said. And just to push that a little bit more, then suppose what we're dealing with is an agency in which everybody agrees that the principal officer can be protected by for cause. Let's just say it's the FCC right after Humphreys. And then that for cause limitation is consistent with Supreme Court precedent. And would your submission be, well, even though that's true, even if you flip that and made that person at will, there can't be ALJs within that agency that have a good cause protection that's enforced by what's now the at will principal officer. Yeah, I think the key, the single cause, double cause, none of these are bright line rules. The ultimate question in the cases is whether the precedent has sufficient control over the executive power. And if the standard for good cause is too broad, and maybe I said we'll make this clearer, imagine you take the PCAOB standard, the standard that required willful violations of law or rules. If that standard were imposed, even in an executive branch agency, I think there would be a serious argument, and we would submit that that goes too far to prevent the president from exercising sufficient supervisory control over the executive branch. Because you would have a situation where inferior officers within an executive branch agency could concededly be violating the law, but just because they did it inadvertently, even if they repeatedly did it inadvertently, you couldn't remove them. That would be a serious problem. It is, of course, exacerbated by having a second level of cause. But even the first level of cause, the key is whether there's enough control. The Supreme Court in cases like Perkins, Morrison has said if you have control, then it's okay. Ms. Nussbaum, so you're proposing essentially a sliding scale of executive power. It's not that all the executive power is vested in the president by Article II. It's some amount of control depending on the circumstances, something that we need to evaluate on a case-by-case basis. I mean, is that the position of the government? No, it's not, Your Honor. I'm not suggesting. That's what it sounds like. Well, I apologize if I gave that impression. What I am suggesting is that there's not a bright line, one-size-fits-all rule. We certainly don't think, for example, that at-will removal is required up and down the chain for both principal officers and inferior officers. And, in fact, we know that from the Supreme Court's decision in Perkins. But the fact that the Supreme Court in Perkins upheld some cause restriction for inferior officers doesn't immediately uphold any old cause restriction, no matter how broad or how narrow it is. Ultimately, the question is, does the cause restriction that's imposed foreclose the president from exercising the executive power? All of it, not some of it. I didn't mean to suggest any sort of sliding scale. The question is whether the president has control over the executive power. What we're finding is a functionalist control, some kind of, like you're asking us to decide that there is some level of functional control that is part of Article 2. Well, again, Your Honor, the Supreme Court in Perkins upheld a cause restriction for an inferior officer. So we know to some extent that the president does not need to have the ability to fire, at will, an inferior officer. And it's not hard to understand why that would be the case. Because inferior officers, in general executive agencies, have to follow the directions of their principal officer. And since the principal officer is at will removable, that gives the president complete control over the agency. He might not be able to fire everyone the day he comes into office. He might not be able to clean house and make sure everyone has his general priorities. But he can make sure that they all follow the directions of their principal officer. Your position is that the secretary could not, even under your reading under the statute, fire the ALJs for policy disagreement. Is that correct? And the reason why... Where's the executive control there? It's a function of the fact of the unique nature, adjudicative nature of ALJs. The executive power that ALJs are exercising is the power to act based on law and fact. They don't exercise policy makeover. And ALJ cannot say, I think that the law and fact point in one direction, Mr. Smith should win, but I'm going to rule for Mr. Jones because of policy reasons. That is not... Could the secretary rule on that basis? If the secretary were to make that decision as opposed to the ALJ? No, he could not, Your Honor. The secretary, if he was adjudicating a case, is required, just like an inferior officer, adjudicating a case involving private parties' rights and responsibilities, he's supposed to exercise it based on the law and the facts. That's what the APA... But the secretary could be removed by the president for any reason at all. Right, but that's because the secretary runs the entire agency. He doesn't have just adjudicatory power, and he's also the head of the agency. They're just a fundamental difference, both in terms of the scope of his responsibilities... But it's not different in terms of the private rights that are being adjudicated. It's true, Your Honor, but the reason that... The primary reason why the president has to have at-will removal of his secretary is because the secretary has a much broader range of powers than just being an adjudicator. He does a lot of other things besides applying law to fact. ALJs, on the other hand, the only thing they do is apply law to fact. It would not be permissible for them to take into account policy separate from law and fact, and in those circumstances, we do think that it does not trench on Article 2 to say that the grounds upon which you can remove this person is if their errors or misconduct pertain to that, but it doesn't have to sweep more broadly. So when you say... What your standard is, misconduct, that's easy. Poor performance, that's easy. Failure to follow lawful directives. I take it from what you just said, the secretary could not lawfully fire an ALJ or direct an ALJ to decide a case in a particular way based on the secretary's best judgment of the law and the facts and any policy? Your Honor, the question of whether you can direct on the front end is a tricky question. As I'm sure Your Honor is aware, we cited language from Chief Justice Taft and Myers suggesting that sometimes with an adjudicative officer, there are limits on the ability to direct on the front end. Yes, and I mean, it is a hard question. It sounds like you're trying to fudge a little bit with failure to follow lawful directives, so I want to make sure I understand what you mean by that. And so I think the key thing for the purposes of this case is that regardless of what you can say on the front end, there is power on the back end, that if the adjudicator makes errors of law and fact and the secretary thinks they've made errors of law and fact, we do think that that constitutes the type of poor performance that can be grounds for removal. And that is one of the significant differences between our position and the position of amicus and the MSPB. They seem to think that it's an extraordinarily narrow set of circumstances where an ALJ's substantive decisions can be the basis for removal. Now, to be clear, even they concede that that can happen in some circumstances. They concede, for example, that if an ALJ refuses to comply with a binding rule of precedent, he can be removed. They concede that at a high rate of adjudicatory error, he can be removed. So we're talking about on the margins where on the continuum adjudicatory errors can be the basis for removal. But the critical point for this case is that wherever you think that has to be as an Article II matter, nothing in the statute unambiguously forecloses allowing removal in those circumstances. The language of the clause— Let me try one more, which is instead of on the front end, the secretary instructs the ALJ to decide a case a particular way, ALJ says, no, I'm independent, and then they try to remove him for insubordination. Instead of that, the secretary says to the ALJ, I've looked at your recent decisions under the Horse Protection Act, and I think that the penalties you're imposing are too aggressive or not aggressive enough. And I make that judgment based on my assessment of competing policy concerns. Could he do that? Again, I guess I'll say a couple of things. The first is that there's no question that the secretary could, for example, promulgate general rules and regulations governing matters such as the proper penalty, and those would have to be complied with. There is a difficult question about whether the secretary could give front-end direction about how to resolve a particular case or controversy before an ALJ. But however you resolve that question, at a minimum on the back end, the secretary could take account of what the ALJ did. That's the dichotomy that the court drew in Myers, and the key point for the purposes of this case, which is a challenge by a private party saying that the ALJ can't exercise adjudicatory power because the secretary doesn't have enough removal power over him, is that nothing in the statute, in the language good cause, forecloses what I just said. So whatever level of control you think Article 2 requires, whether it be removal on the back end or the ability to remove on the front end for failure to follow a direction, whichever one of those things you think Article 2 is required to cover, the statute can be construed to cover that. If we're talking about the back end power, if we shift things to the back end and we say that the secretary could respond to a particular resolution in effectuation of what the secretary thinks the right result should be, and of course the secretary can reverse it, but the secretary can also take other actions. Let's suppose the secretary can just decide I don't want this ALJ to be deciding this category of cases or any category of cases, and so the secretary just decides I don't have independent power to remove, but I have independent power to reassign, and I'm just going to reassign down to zero. If that's consistent with the existing statutes and the secretary can take that action, is that still a problem that the secretary doesn't have the removal power, even though the person isn't exercising any authority on a case-by-case basis? It potentially does. It's not one that implicates the rights and responsibilities of anyone who that ALJ does adjudicate. So obviously it's a difficult hypothetical answer because it's not facts in this case or any case, but the distinction I'm trying to draw is if the removal standard is too high, it is a problem if an ALJ adjudicates cases subject to that standard. It is no answer to that problem that the secretary could have sidelined the person. But if the secretary does sideline the person, we agree that that mitigates the problems with the secretary and the president's control over Article 2. It might not completely obviate them, as we explained in our brief. It's possible that the fact of being forced to keep that person on the payroll and on the budget and have to basically offload all of his work onto other ALJs might be a separate Article 2 problem. But the key point for purposes of this case is that that is not an Article 2 problem that implicates the rights and responsibilities of people like Petitioner, i.e. regulated parties who are subject to adjudication before an ALJ. It also sounds like it would be quite a different question about the degree or nature or intingement on presidential prerogatives if all that you have left is an ALJ who is technically not removed but isn't deciding anything. Yeah, I agree. I think it is definitely a different question. But the key point is, for our purposes, A, it's a different question on that hypo, but B, it's not that the existence of that hypo isn't sufficient to say any old cost standard is okay. If this cost standard is too high, then it is a problem in this case. So it's important that if the court were to reach the merits, which, of course, we don't think you should given the forfeiture, that is not a defense to the standard that actually exists, and it's important to recognize that the current standard, as construed by the MSDB and as defended by the amicus, is too broad, but it can be construed more narrowly, and under the canon of constitutional avoidance, it therefore must be construed more narrowly. So just help me out on that last piece. Just one last follow-up. If Judge Rapp, if that's okay, I'll just have one last follow-up. And then, obviously, we'll go to your question. And just help me a little bit on why, if the Secretary does have that authority to sideline and could sideline in a way that removes the ALJ from decision-making authority on anything that matters in a material way vis-à-vis presidential prerogatives, the existence of that authority isn't enough of an answer. Because when they don't exercise that prerogative, when they don't sideline them, and the ALJ is then exercising adjudicative power, if they have too high a removal standard, so imagine it was the PCAOB standard, for example. It could only be removed if they willfully violated the law. While they are exercising that power, they know that once they issue that decision, they're protected, and that is the insulation that's a problem. And that's why the standard that's in place while they're adjudicating must be broad enough that they know that they are subject to supervision by the agency head. It has to be a standard that allows the agency head to do that. So while they're adjudicating, there's the possibility of sidelining, and over that, there's the possibility of the removal of the Secretary at will for not sidelining. So that's always true that right up until the second the decision comes out, they could be sidelined. But the second the decision does come out, and by the way, in the real world, it's not like the Secretary is going to necessarily know what an ALJ was going to say until he says it. So once the opinion does come out, you have the problem. You have the issuance by an ALJ of a decision that under the APA will become the agency's final decision in the absence of fellow review, and it was issued by someone who was unconstitutionally insulated. And we know from PCAOB that the fact that the Secretary could reverse that decision on the back end isn't an adequate defense, just like the fact that the SEC could overturn all of the PCAOB's rules wasn't an adequate defense. The point is that when the ALJ exercises executive power, which in this case involves issuing a final decision, among other things, when he's doing that, he has to be subject to a standard that permits removal in ways that give the Secretary, and therefore the President, and therefore the public, adequate control over his actions because he is ultimately exercising executive power. Judge Rao, sorry. No, it's fine. So I guess my question is, how is your reading of good cause for statutory good cause consistent with longstanding understandings of what that term means, longstanding interpretations by the Supreme Court of what that means? I mean, perhaps your interpretation makes this scheme slightly more constitutional, even if not entirely constitutional, but how is it consistent with longstanding understandings of what good cause means? Well, Your Honor, I don't think there is a longstanding understanding of good cause in this context. And by that, what I mean is there is certainly an understanding that has developed over time about what cause is for purposes of the heads of the so-called independent agencies, principal officers, right? But the court has never said what cause is for purpose of inferior officers. And that's a very, very important difference as a statutory matter and as a constitutional matter. Inferior officers are inferior because they're supervised by principals. So you would normally assume, and I'm sure the Supreme Court of course assumed in cases like Perkins, that it would be cause for removal to not follow the directions of the principal. That is the basic insight that is reflected in this court's decision in Caleris, where you held that the Benefits Review Board within the Department of Labor should be treated as at will removable rather than subject to the Humphreys Executive Standard, even though it was doing the same sort of things as the Humphreys Executive Agencies. If that entity had been placed outside of the Department of Labor, what you might think of as cause is very different than what you might think is cause for something within the agency. And the reason for that ultimately is about political accountability. These are entities, officials, who are exercising the secretary's power. They're engaged in adjudication, pursuing his delegation on his behalf. But then they're reviewed. So I guess another question I have is why isn't the MSPB, I mean, isn't the MSPB part of the executive branch? I mean, one of the interpretations that you keep arguing against is the MSPB's interpretation. But isn't the MSPB part of the executive branch? It is part of the executive branch, Your Honor, but it is part of the executive branch that is subject to the INM cause standard. And so in that circumstance, you do have the dual levels of cause that were at issue in free enterprise funds. If you say that the MSPB is doing something more than what a court would do, it's not just determining whether the legal standard of cause that we think Article 2 is required is met on the factual circumstances of the case. If it is instead exercising policy discretion, then it presents the same problem that was presented in SEF, where you had both the cause standard for the PCLB layered on top of that, the SEC's cause standard about whether to remove them. The SEC was, of course, in the executive branch too. Your position is that two layers of four-cause removal are fine for executive branch adjudication, where people's private rights might be at stake. Again, I think it very much depends on what those levels of cause are and what they're doing. We're not saying that any level of cause at both of those standards are always okay or always not okay. Well, but I think your position assumes, for instance, that the president couldn't tell the MSPB to adopt a different four-cause standard, right? You are currently arguing a four-cause standard that is different from the four-cause standard adopted by an executive branch agency. So how does that work? So what I was saying is I think it's very much whether a dual level of cause is okay or not okay very much turns on what those levels of cause are concretely. And what our point is is that at the first level, the level that applies to the ALJ here, the standard that the MSPB has adopted, whether it's the MSPB that adopted or a court or anyone else, we think that the standard has to be very broad. It has to be what we said about misconduct or poor performance or failure to follow directions. If that standard is not that broad, then there is a problem because the agency head doesn't have sufficient control. But if it's failing to follow direction because it disagrees with the Department of Justice's interpretation of cause? Again, I'm talking about the first level, the level of cause that governs the ALJ, not the standard of cause that governs the MSPB. I mean, under your theory, they both have to operate at a certain level for this to be consistent with Article 2. Right. But as I was saying earlier, I think there's a very big difference between the level of cause that's tolerable for a freestanding independent agency on the one hand, which is like MSPB and SEC, and on the other hand, an inferior adjudicator within an executive branch agency who purports to be acting on behalf of the Secretary. That makes no sense. You're saying the president can be tied down more strictly in regulating the single-member head of the CFPB than in regulating some hoedown ALJ? Look, Your Honor, obviously the Supreme Court in cases like Humphrey's executor have upheld independent agencies, freestanding independent agencies. We take those presidents as they come, and those presidents, of course, bind this court. What the court has never upheld is the notion that within an executive branch agency, you can have an inferior officer who doesn't have to listen to what their boss tells them to do. That would be a fairly remarkable holding and is very much contrary to the reasoning of the Enterprise Fund, which is that the removal of restrictions are intended to achieve political accountability both to the president and ultimately to the public. So our point is simply that if we think that the court's plan for ALJ is too narrow, but it can be construed broadly enough, and if it is construed broadly enough, the fact that at the second level the MSPB is there on the back end, that is no different than the fact that the court is there on the back end. As long as the MSPB is acting like a court, i.e., it is applying that legal standard to given facts rather than exercising policy judgment. Because at that point, if the MSPB exercises policy judgment, then I very much agree with Your Honor. That's where the problem is of now you've got two levels of cause. You've got first a level of cause for the ALJ, and then you've got this independent agency, and the two of them together, that's a problem for the reasons FDF gave. I mean, it would be just as easy to say that at the first level of cause, adjudication requires robust protection, and that's Wiener. And so, you know, fine, that piece of it has to be fine under Wiener, just like the top level, inefficiency, neglect, et cetera, has to be fine under Humphrey's Executive. I mean, so I don't know what you're left with other than a rule from Free Enterprise Fund that two levels is too much. So I don't think so, Your Honor. With all respect, I think that, as I was saying earlier, the attempt to take Wiener and apply it to an inferior officer within an executive branch agency would be a radical extension of Wiener, and it's exactly what this court in Claris refused to do, right? The Benefits Review Board is no different in terms of what it does than the War Claims Commission in Wiener. It is an entity that exists and adjudicates claims, and that's all it does. But this court in Claris recognized that, no, we're not going to assume that that thing is subject to four-cause restriction. Why? Because unlike the War Claims Commission, it is not a freestanding entity. It is within the Department of Labor, and it's exercising the Secretary of Labor's adjudicatory power. That is a totally different circumstance, and it makes perfect sense when the point of removal restrictions and the removal of jurisprudence is to ensure that the Cabinet Secretaries and the President are ultimately accountable people to say that in that circumstance, even in the adjudicatory context, it is not permissible to have the sort of broad-cause restrictions that are tolerable under Humphrey's executor outside of an agency. To be sure, as we discussed at the very outset, we're not saying you need to have at-will removal over an ALJ. We recognize that the special nature of what ALJs do means that you don't need to be able to fire them for any ground. And I think the easiest way to understand that is I don't think anyone would think that it would be, for example, a double-four-cause problem if you couldn't fire an ALJ or the PCOB members on the basis of their race or sex. That would still be two levels of cause, but the level of cause at the first level would be so narrow and so not intrude on the President's ability to actually control the agency that there would be no problem. So that's why I think the critical point for the first level, the level of the ALJ, is can the Cabinet Secretary and the President have control over what the ALJs are doing? And you can accomplish that by construing the standard as we have to give control over their actual functions but not to make the at-will removal so that you can fire them for things other than adjudications by law and fact and give rise to all the concerns that the APA was worried about, about them acting as political tools rather than neutral, impartial adjudicators. But once you do that, once you have that level of cause, as long as all that's left is adjudicating as a factual matter, whether that cause standard is met, there's not a double level of cause any more than there is when a court adjudicates cause. The problem on the MSPB side comes when the MSPB asserts policy-making judgment rather than when they just apply law to fact. And we think that the statute can be construed. The statute says established and determined by. We think that can be construed as found by. We think at a minimum that construction is at least as possible as the construction in NFIB that shall by insurance can mean may by insurance. Or the construction in public citizen that utilize means something more than use. So can I just ask you about your alternative construction? I mean, if you were to reject your statutory interpretation, then what precisely – I'm not certain precisely in your brief what you're suggesting as the fallback alternative. Sure. So I'll try to answer that question, though it's a little hard to answer it in the abstract because I would need to know what aspect of our constitutional ruling you would reject it. But at the first level, I think the biggest statutory problem and biggest constitutional problem with 7521 is the established and determined phrase, which seems to – which the MSPB has construed to give them power to exercise policy-making judgment over what causes. So I would say that what you could do, for example, is strike established. And if it just says determined, then I think it is easily susceptible to the construction that all they're supposed to be doing is finding whether a good cause exists and the court can say what a good cause means. I guess what I'm confused about from your briefing is, I mean, do you think of this as just an as-applied challenge to USDA ALJs? Or are you suggesting that we make that determination about 7521 for all ALJs? So, look, the posture of this case is a private plaintiff who is saying that the ALJs at the USDA can't adjudicate cases against them. So I think that the proper – if the court were to decide that that claim's not forfeited, that the claim is meritorious, that the statute can't be construed that way, and so some aspect of the statute needs to be severed, I think the proper remedy would be to sever whatever part of 7521 this court thought was impermissible as applied to USDA ALJs. So, as-applied, not separating spatially for all other ALJs. Yeah, I don't see what any basis that this plaintiff has even standing, Article III standing, to ask for that sort of remedy for all the same reasons that the government is consistently arguing against nationwide injunctions and nationwide baconer. I just want to confirm that because there's some language in your brief, I think, that was not entirely clear about that. I apologize about that, Your Honor. What we would mean is that if you think that there's a constitutional problem in the statute, we think that you should sever that aspect and only that aspect, and yes, as applied to USDA ALJs, and leave for other cases whether other ALJs either present different questions, you know, for example, whether they're officers or for any other reason. If I could say one last point on the remedy, I know I'm well over my time. Judge Katsas had asked earlier whether instead the remedy should be to invalidate the MSPB restriction rather than the 7521 ALJ restriction. And I think that would be improper for two reasons. One is that it's overbroad. No, no, no, I'm sorry. Maybe I wasn't clear. What I was suggesting was we simply take the MSPB layer of review out of it, not that we eliminate the MSPB tenure protection. Oh, I see. Sorry, I misunderstood you. Yes, so if that is what you were suggesting, then yes, that is essentially what I said earlier to Judge Rao as the first step in our severance. It's a little bit broader because you're saying strike the word established and retain good cause determined by the MSPB. And what I had in mind was strike the phrase established and determined by the MSPB. Okay, fair enough. And I guess there is an important difference on that, and so I should flag it, which is I don't think that someone is going to have to adjudicate whether the good cause standard is met. I think the court's cases, in cases like Perkins and Morrison, recognize that, for example, certainly a court, a federal court, could determine whether good cause was met. And it's hard for me to see why there would be a constitutional Article II problem if the only thing the MSPB was doing was the same sort of fact-finding determination that we think a federal court would do in this circumstance, which is to actually commit the misconduct. As opposed to having the adjudicator be the president's alter ego, akin to what happens when the president adjudicates good cause in deciding whether to remove an independent agency head. Well, just to be clear, Your Honor, that might be true if there was not going to be any review at all by any sort of adjudicative tribunal. But I think it would be undoubtedly the case one way or the other that on the sort of scheme you're contemplating, if the employing agency said, we have looked at this and we determined that we have good cause, I would suspect we would probably see a lawsuit in federal district court saying we disagree with that. We know from Morrison and Perkins that judicial review of a cause determination doesn't count as, like, quote-unquote, a second level of cause. And so my only point is, just like a federal court can do that determination, it's hard to understand why the MSPB, who is more accountable to the president than a federal court, can do the same adjudication. But the critical point is it's got to be that adjudication, not what the MSPB has been doing, which is exercising policy judgment over what counts as cause and whether someone should be fired even though they've committed the cause, rather than be suspended or disciplined. I mean, I'm a little surprised to hear you say that, because when the court adjudicates, when the claims court adjudicates the money claim by the removed officer, that's not an issue of presidential control within Article II. That's judicial at that point. This is about – we're talking about what happens within the executive branch, right? That is right, Your Honor. I guess my only point is, from the executive branch perspective, the current statutory scheme is set up that it goes to the MSPB and then from the MSPB to the federal circuit. Cutting the MSPB out of it entirely would seem to likely lead to a flurry of district court lawsuits, which, even from the executive branch perspective, does not seem advisable. Got it. Just one more question from me, which, in fact, back to the merits for a second, which is I take it from your position. Your theory is that good cause, as used in 7521, means something radically different from inefficiency, neglect, or malfeasance, correct? I think that's right, yes, or at least how the latter phrase has ordinarily been understood and assumed in cases like the randomized fund. So what authority do you have for that proposition where it seems like – I mean, if you take free enterprise, the court uses the phrase good cause as shorthand for INM. If you look at the Fifth Circuit's PHH case, Judge Higginson pressed this theory, and he got not very many votes, and all he could cite for that was a law review article. Well, the best example I can give you is Perkins, right? I don't think anyone thinks that the inferior officer in Perkins should have been removable only for the sort of INM standard, right? That is the better analog here. You have an inferior officer within an executive branch agency. Yes, they can be subject to cause restrictions, but that does not mean that they should be subject to the type of cause restriction that the head of the SEC or the FTC have been understood to be under. And again, that is the central insight of this court's decision in Claris, where it refused to treat the benefits review board the same as the FTC, precisely for the reason I'm saying, that it was within an executive branch agency rather than external to one. And by the way, just the last point I'll make is the language is, of course, different, right? One says good cause. One says inefficiency, neglect of duty, or malfeasance. There's no reason as a textual matter why the court should construe those two things to be the same thing, and there's a very good structural reason why you should not. Thank you, Mr. Milken. If my colleagues have no further questions for you, and we'll hear from Amicus. Thank you. Thank you. May it please the court. May it please the court. Prateek Shah's court appointed Amicus. Petitioner's separation of powers challenge is predicated on an analogy to the unique dual floor cause removal structure in PCAOB, in which Congress had injected an intermediate decision maker with tenure protection, the independent SEC commissioners, between the president and the board members. In other words, to quote the Supreme Court in PCAOB, and this is at page 507 of the opinion, the president, quote, had no authority to initiate a board member's removal floor cause. But that is not the case here. The president has authority via the Secretary of Agriculture, who is removable at will, to initiate removal of the Department of Agriculture ALJ floor cause with no intermediate tenure protected layer impeding that decision. That makes the removal scheme here fundamentally different than that in PCAOB and much more like that in Morrison. A mountain of precedent, history, and practical sense permits Congress to require ordinary good cause subject to MSPB review for the president's removal of an inferior officer charged with adjudicatory functions. The government appears to agree with that conclusion with two caveats. One, that good cause must be construed broadly, and two, that MSPB's review rule must be construed very narrowly. Because neither caveat is constitutionally significant, however, the scheme should be upheld, even rejecting the government's proffered constructions of Section 7521. I'm happy to talk more about... We perhaps put you in a tough position by framing a question for you, just assuming that the government's construction of the statute is wrong, but do you have a view on what the right construction of good cause is? Well, we think, Your Honor, that at least from a constitutional perspective, the interpretation of good cause that the Federal Circuit and the MSPB have been building for, I guess, 75 years now is perfectly reasonable and makes a lot of sense. Essentially, the guiding principle as articulated in Federal Circuit precedent construing 7521 is that it has to be conduct that undermines the public confidence in the duties of the ALJ. And that's the guiding principle. It has to give some measure of public confidence in the ALJ's adjudication. And that's why it's in recognition of the fact that adjudicatory officers here are different. And so I think it's not even clear to me how different the government's articulation of good cause is, really, from that of the Federal Circuit when you apply it to ALJs. I think the government agrees, at least in their opening brief, that it certainly can't mean they give these reasons. They seem to also agree, although I'm not exactly clear on the contours of it, that they can't direct an ALJ to come to a particular outcome and then fire them for not getting to that outcome. It seems to me extremely different because Mr. Lupon was fudging a little bit on what he called the front-end question about directing decisions. But he was very clear that ALJs can be removed on the back end simply because the secretary disagrees with their decisions. And that seems vastly different from current understandings in MSBB law. Yes, Your Honor, that was the third category I was going to get to, which was their line about not intelligently or wisely exercising discretion, which I think is where that's coming from, from Myers. Yes, that would depart from the established and any conceivable meaning of good cause. Good cause cannot possibly mean that even if an ALJ applies the law and the facts, just because there's a policy disagreement by the secretary that he didn't, quote, intelligently or wisely exercise his discretion. As this court knows from substantial evidence review and all sorts of other standards in the law, that there may be different outcomes that a person can reach, but it doesn't mean that they've acted flagrantly in violation of the law when reaching those outcomes. And so we agree, Your Honor, if good cause, it's no longer good cause if it encompasses a disagreement with an ALJ's decision. An ALJ has to have the freedom to apply the facts in accordance with fair interpretation of the law and lead to an outcome and not have that adjudication be under the threat of removal just because the secretary wants a different outcome. There would be no difference between the front end and back end situation. It would be good cause. The language in good cause cannot support that loose of an interpretation. So here's the Article 2 concern I have with that, which is you make a powerful case that adjudicators are different. They're just calling the balls and strikes. Adjudications under the Horse Protection Act don't seem like the most weighty exercise of executive power one can imagine. But there still are policy judgments, maybe not in adjudicating the violations, but certainly in setting penalties. Penalty clause just says determine an amount considering the nature of the offense, the circumstances, the extent, the gravity, the culpability, the ability to pay, etc. There's surely legitimate range of policy judgments about what's an appropriate level of sanction. And how does the president, or less grandiosely, the Secretary of Agriculture, control the exercise of executive power when he thinks that an ALJ is being either too aggressive or not aggressive enough in making those sorts of policy decisions? Sure, Your Honor. I guess a couple responses. One is, to me, those are part and parcel of what judges do. Judges all the time create sentences within the range that the legislature permits them to pronounce a sentence or a remedy. And that's precisely what's going on here with the ALJs. If the agency wants to exercise greater control over the ALJ's sanctioning, then it can promulgate rules, and the ALJ has to follow them. Instead of saying, leaving it to the ALJ to come up with a sum between zero and a million dollars, it can promulgate a rule that says you can, if the conduct is X, then the range is zero to $1,000. If the conduct is Y, the range is one to $2,000, and the ALJ has to follow it. So there are all sorts of tools that an agency has directed at will removal by the president to cabin that sort of discretion to the extent you find that to be policymaking rather than adjudicatory. Can I ask this question? As you understand the MSPB's understanding of good cause, would it be in conflict with that understanding of good cause for the secretary to take actions that sideline an ALJ but don't remove that ALJ? I guess the question there is whether that would be considered a constructive removal. As I understand it, the MSPB does have some jurisprudence on constructive removals, and so I could imagine a circumstance where an ALJ could argue that that sort of sidelining would constitute a constructive removal, and therefore they would try to challenge that and say it's not supported by good cause. But I guess it would depend on the circumstances and whether it rose to the level of that constructive removal circumstance. Is sidelining consistent with 5 U.S.C. 3105, which says ALJs should be assigned to cases in rotation so far as practicable? I would have thought not. Yeah, I am not aware of agencies doing this, so I'm just taking the hypothetical as it's given. I would think that an ALJ would have a pretty good constructive removal claim if they truly were sidelined and taken out of the rotation, as you say. But I'm not aware of any cases that are – I can't speak to how the MSPB has actually adjudicated that because I'm just not aware of any of those that exist. Can I ask a question about something that's more squarely in the briefing, which is both Judge Kavanaugh and his dissent initially in free enterprise and in all the briefings, there's the point that's made that the use of ALJs is optional as one possibility as a basis for distinguishing the result in free enterprise from the conclusion that's being put forward by petitioners in this case, or the conclusion that there's a constitutional problem here. What role is that piece providing in the way you're looking at it, given that your threshold submission and the principle force is about adjudicative functions? But then there's this overarching point. Look, whatever you think about adjudicative functions, the point is that the agency can just structure things in a different way. They don't have to go to ALJs at all. The secretary him or herself could do everything. ALJ use is entirely optional. Sure, Your Honor. So I would view it as on three different axes, the levels of distinctions that we would raise from a PCOB-type situation. The first is the one that you mentioned, adjudicatory versus expansive enforcement and policymaking duty. That one I think everyone understands. The second one is the unusually high bar to removal, which has been touched on in the earlier argument. It was a much higher bar than even the normal good cause standard that's been recognized by the Federal Circuit and MSPB here. And the third, I would group under this third heading here, which I think has two facets. One is the one, Chief Judge Srinivasan, that you just mentioned, which is, look, the agency has a whole lot of ways to control ALJs and the power that they exercise. The first threshold one being that Judge Kavanaugh recognized in footnote 8 of his dissent in PCAOB is that, yeah, as a threshold matter, they don't even have to use the ALJs for the adjudications. And then, of course, there are other ways, as I was discussing with Judge Katsas, they can certainly cabin the discretion by promulgating mandatory rules that the ALJ has to follow, both on substance and on remedies. So I think there's a host of factors there in which the President and the Secretary of Agriculture, by default, who's removable at will by the President, can, in fact, exercise the executive power with respect to ALJs. The other dimension of that, the fact that these ALJs. Well, oh, there's no problem here because the Secretary can just himself undertake every Horse Protection Act and every other adjudication that's in the business of USDA. Right. So the agency does have the choice under 5 U.S.C. 556B whether to use ALJs for hearings. That is their choice. Now, as a practical matter, it may be. I think USDA only has two ALJs, so we're not talking about kind of an army of ALJ work here. But, yes, the statute gives them a choice. As a practical matter, it may be that the Secretary chooses to do it, but I'm not sure it's an all or nothing. I would think, because the statute gives them the choice, that at least by regulation, they could promulgate categories of cases that will be adjudicated by ALJ hearing versus those by the Secretary. I don't think there's anything in the statute that would preclude the agency from saying these categories of cases are going to go to the Secretary for adjudication and these other categories of cases are going to go to ALJs for adjudication. Can I ask? Oh, I'm sorry. I just had a question about some of your due process points. You argue that due process requires some form of impartiality, and I'm wondering how that squares with the fact that the statute allows the Secretary to, you know, to have these hearings. So I guess are the due process standards different when the Secretary conducts a hearing versus an ALJ? And I guess if you think those would be different, how would we explain why they would be different? Sure. I think they could be different. Your Honor, this hasn't been litigated, and so I don't have case law to draw upon. But I can reason why they could be different, and the reason would be this. When the Secretary is adjudicating a matter directly, it is coming under the full accountability of the Secretary himself or herself doing the adjudication. So there's no doubt about it that this is coming from the head of the agency. However, the whole APA was premised on the notion, and it was based on this long history recognized in the Roundspec case from the Supreme Court, that, look, this was a long time coming in that the problem was that people were viewing the hearing examiner, sort of the precursors to the ALJ, as just tools for the agency. And so when you have the statutory structure and the agency choosing to implement the statutory structure, with the whole idea being now you're going to give some sort of imprimatur of adjudicatory independence coming into play, that that triggers a different level of protection than you would have when you just have the Secretary as head of the agency. Even if it's the same matter, resolving the same matter, when you're having the trappings of an administrative law judge, all of the protections in the statute, that that comes with the notion that there will be some measure of separation from the political directions of an agency. And so I think there is room that even though it doesn't have to make the choice, once it makes the choice to use ALJs, that that then triggers some very basic due process protections. We're not arguing that these are the same due process protections that you would get in an Article III court or anything like that. Our main point in raising the due process concern is as a counterweight to the government's constitutional avoidance argument. They say, look, that because you would potentially raise these separation of powers problems, you have to read good cause as meaning something really much lower than good cause. Well, there's a counterweight when you do that, and there's a constitutional counterweight in that it starts to run up against or at least implicate due process concerns. And so the canon constitutional avoidance isn't the normal fallback that the government can rely on to avoid a reasonable reading of good cause. Can I ask you to finish out the list you were giving on the ways to— Yeah, sorry. I'm talking from free enterprise. No, no, no, not at all. I just want to make sure that I hear the end of the answer, which is, as I understand it, you've got three categories. The first is adjudication. The second is other options, which would include the option of not using an ALJ and then the option of doing regulations. And then you were going to go somewhere else. Okay. So I guess my three categories would be adjudication versus enforcement policymaking. Two, unusually high bar, so the level of removal bar in PCAOB was much higher than here. And then the third I would put is in the nature of the fact that we're talking about agriculture here rather than SEC in PCAOB. And the reason I think that matters is because the secretary of agriculture is directly removable at will by the president. And so there's two sets of arguments that flow from that. The one that we already talked about is that the secretary can simply order different rules and regulations, or the president can simply order that the secretary introduce new rules and regulations to limit the ALJ discretion. The second set of arguments is the one that I didn't get to. And that's really the one that the SG acknowledges in their brief in Lucia. This would be a much closer call on the separation of powers question, arguably, if we were talking about SEC ALJs. And the reason, of course, is because the president does not have a direct link to removal of an SEC, to initiate the removal of an SEC ALJ. It first has to go through the SEC commissioners, which have a for-cause removal. It can't just order the secretary of agriculture at the threat of – like he can the secretary of agriculture at the threat of at-will removal to do it. That is a significant difference. You don't have – and if you look at PCAOB, one of their – when they're talking about dual layer of concern, what's driving that dual layer of concern is the fact that you're interjecting an intermediate for-cause layer between the president and the initiation of the removal. You don't have that with agriculture because the secretary of agriculture, at least at the pain of at-will removal, has to follow the president's direction to initiate removal for-cause. And so that, we think, is a major difference here. And it's the difference that the SG, the government, in fact, relied on in Lucia when it said that we'd have a very different case if you were talking about an executive agency. Well, we have the executive agency here. The executive agency, I guess, it's seizing on the word initiate because the secretary can initiate but can't complete. Yes, that is true, Your Honor. But that – the second layer of removal – I don't view this as a second – as a dual for-cause removal case in the sense that PCAOB is using the term because the second layer for-cause removal comes on the back end. The MSPB never initiates any removal. It's unlike the SEC in the PCAOB case, which is the entity – which was the decision-maker that would have to decide, okay, do we want to put this board member or ALJ up for removal or not? The MSPB is never taking that active role. It is serving a purely adjudicatory function on the back end. It's the political actors, the president and the secretary of agriculture that are going to decide whether an ALJ in the Department of Agriculture is up for removal. It's going to make its good cause showing. And then it's the MSPB on the back end that is going to adjudicate that. And that's in almost every for-cause removal regime. Otherwise, the for-cause would have no teeth. But you're going to have some adjudicatory body actually confirm the existence of good cause. Now, in Morrison v. Olson, that body was an Article III court. If the attorney general exercised its removal power for good cause against the independent counsel, again, just like here, the court reasoned that the president could direct the attorney general to remove the independent counsel for for-cause. So there was a direct link between the president and the independent counsel. Then there was judicial review in an Article III court to determine whether that removal could stand or not. Here you have the adjudicatory body, the MSPB. And on this point, I agree with Mr. Mufan. One would think that that's less of a burden on the government because it can at least exercise some control. MSPB is another executive body. It at least can exercise some control over that body. And it actually gives more control to the president in the sense that it's the MSPB that's creating the record, that it's simply going to be reviewed under a very deferential standard by the federal circuit, as opposed to the Morrison v. Olson situation where the good cause in the first instance is reviewed by the federal court. So it's the federal court that's doing the fact-finding and coming up with the record to determine whether the good cause standard is satisfied or not. So we don't think this is a dual for-cause removal case in the sense of PCAOB. It would be if we were talking about SEC ALJs. And so, you know, to go from PCAOB to this case is quite a leap. If you had Lucia, if the court had decided Lucia and said, okay, well, we find the same dual for-cause problem as we did in PCAOB, notwithstanding the fact that we're talking about purely adjudicative officers, well, then maybe you would have a building block and say, okay, well, they've taken that step, and now we have to decide whether we're going to take that step. But you don't even have that intermediate building block. So you have all three dimensions of distance from PCAOB in this case. It's not the right case to break new ground and argue. Do you see any distinction between the judicial review possibility? I take your point that judicial review is a back-end layer in every regime to some extent. But do you see any constitutional meaningful distinction based on the fact that with judicial review, the removed officer would initiate it, whereas with MSPB review, such as it is, there's no need for anybody to initiate it because the MSPB is involved, has to get involved at the outset to effectuate the removal to begin with. You know, I don't think so, Your Honor. It's hard for me to imagine why it would be constitutionally different if the statute had been just slightly written differently, that the removal is effective upon the secretary's decision, and then it goes to the MSPB for confirmation as opposed to the fact that the agency files a complaint and the MSPB makes the final determination. It's hard to see why that makes a constitutional difference in the Article 2 sense. The other point I would make is Perkins. In Perkins, and this is the oldest case, the 19th century case, about the naval officer, the military officer. And there, even though you would have the secretary of Navy doing the initiation of the removal, it would be a court-martial proceeding that does the misconduct finding. So much like the MSPB, you have another executive body that would be finding the four cause, the existence of the four cause misconduct. And so that's a lot like what we have here. And it's hard to distinguish that from what you have going on here, another executive body. Of course, more than it was a court, Perkins was not a court. Perkins was another, and my understanding from PCOB's decision, and this is at page 507 in the Supreme Court's PCOB decision, they discussed the modern regime of military officer removal. And what the court says, and this goes to the point about initiation, what the Supreme Court says, if I can find the language for you, here it is. It's at page 507 of the decision, and it says, and this is in discussing the military officers, a discussion I assume prompted by the Perkins decision. It says, the president and subordinates may also convene boards of inquiry of court-martials to hear claims of misconduct or poor performance by those officers. And they're talking about inferior military officers. Here, by contrast, the president had no authority to initiate a board member's removal for a cause. And so I think that highlights that PCAOB was really about the lack of the president's ability, having a direct line to order the four cause removal, rather than the back-end protection of the MSPB, which is present in military officer removals, where you have to have a court-martial. The president can order that an inferior officer in the military be removed, but that's subject to review in a court-martial proceeding. And so it's hard to understand why that regime is constitutional, as upheld in Perkins and as it's evolved over the centuries since then. And yet this regime, in which the president has a direct line to initiate the removal of the ALJ, simply with back-end adjudication by the MSPB as to whether that good cause actually exists, why that would be constitutionally different. Thank you. I want to make sure my colleagues don't have any further questions for you before we go back to Petitioner's Council for rebuttal. I'm fine. Thank you, Mr. Shaw. Mr. Boyles, we'll give you three minutes for your rebuttal. Your Honor, I couldn't possibly address the matters that have been addressed in the questions. Let me just mention a few. I understood Mr. Mopon to say the MSPB is an adjudicatory body. It doesn't make policy. That's not so. The MSPB is a policymaking body under 5 U.S.C. 1305. Congress granted it the authority to prescribe regulations implementing and interpreting Section 7541. It doesn't give the Secretary of Agriculture that authority. Second, I understood the amicus to say that kind of, well, really the Secretary is different from the SEC. The Secretary of Agriculture is different from the SEC because he can make the decision to fire somebody. I think it's significant that the Secretary can only initiate a complaint to the MSPB. The MSPB makes the decision about whether an ALJ can be fired. If the ALJ doesn't like it, the ALJ doesn't sue the Secretary of Agriculture, the ALJ sues the MSPB. You cannot sideline somebody by reassigning their cases. That's what 5 U.S.C. 3105 provides. In fact, there have been numerous, well, I won't say numerous, certainly many that I have read, cases where administrative law judges claim they were constructively fired because they got wrong assignments or they were being cut out of the cases or for different things. Those cases have actually gone up to the Federal Circuit. While I can't give you the conclusions of all those holdings, the Federal Circuit and the MSPB have adopted a rule that constructive removal under these circumstances means you still can't work for the agency, whereas initially they decided that you could argue constructive removal by things like taking away the cases under 3105 without why you were still at the agency. Finally, I would like to say we did raise the only issue that we could raise in the adjudicatory proceeding before the administrative body. When you talk about issues, this was an issue we raised. The ALJ and judicial officer enforcement scheme adopted by the USDA contravenes the appointment clause and separation of powers doctrine. That's at the appendix page 416. Second, the USDA ALJ's decisions were adopted by a superior principal officer. As a result, the USDA performed functions that could be performed only by a principal officer. That's 468. Under the USDA's current procedures, no constitutionally appointed principal officer will review, approve, or sign a written order assessing a penalty for a violation 448. Finally, ALJs have civil service protection 429. ALJ officer's enforcement scheme, as I said, violates separation of powers. Here's delegating the officer's powers, quote, to an employee who is not accountable to the president, secretary, Congress, or the public, contravenes the separation of powers structure of the U.S. Constitution and violates the appointments clause, 457. Free enterprise fund addressed for the board members were lawfully appointed under the separation of powers doctrine and appointments clause, 465. We only had an employee when we wrote our brief, and we didn't have the 7521 issue as related to an officer. The facts have changed since we wrote our brief and appealed to the judicial officer. The fact that's changed, we couldn't anticipate. Lucia wasn't decided. We couldn't assume that the ALJ would subsequently be appointed an officer and then argue, and by the way, if you fix your appointment clause problem, then you'll have another one. I'm sorry, I don't think that that duty is imposed on counsel to raise issues that aren't right for decision. We raised the separation of powers issue. The forfeiture should not be an issue. Thank you. Thank you, Mr. Broyles, and thank you to all counsel for your arguments today. Mr. Shaw, you were appointed by the court to assist us in this matter. The court greatly appreciates your and your team's efforts and thanks you for your very able assistance. We'll take the case under submission.
judges: Srinivasan, Katsas, Rao